

ORDERED in the Southern District of Florida on December 18, 2023.

_____
**Mindy A. Mora, Judge
United States Bankruptcy Court**

_____

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | Case No.: 22-10140-MAM |
| Louis Robert Adam and Gislaine Adam, | Chapter 13 |
| Debtors. / | |

## MEMORANDUM OPINION AND ORDER DISMISSING BANKRUPTCY CASE

Creditor Highland House of Palm Beach Condominium Association, Inc. (the "HOA")[1] argued for months that this Bankruptcy Case should be dismissed. Debtors Louis Robert Adam and Gislaine Adam opposed dismissal with equal vigor. The Court

---

[1] The HOA is controlled by one couple, Steven Parks and Diana Cuervo-Parks. Mr. Parks serves as President. Ms. Cuervo-Parks serves as Vice-President. Both Mr. Parks and Ms. Cuervo-Parks are licensed Florida attorneys. ECF No. 86-4. Based upon current ownership, the HOA members are Mr. Parks (a voting member), Ms. Cuervo-Parks (a voting member), and the Adams (non-voting members).

held an evidentiary hearing (the "Evidentiary Hearing") on factual issues raised in the HOA's most recent motion to dismiss or convert case to chapter 7 (ECF No. 200) (the "Dismissal Motion") on August 30, 2023. At that time, each side presented a bevy of facts in support of their version of the truth. Despite hours of testimony from parties on both sides and extensive analysis by counsel, this situation was more difficult than most to analyze because both the HOA and the Adams seem to have a hidden agenda that tinged all testimony and argument presented to the Court.

The broader picture, however, is not for this Court to ascertain. The only task before the Court at present is determining whether this bankruptcy case should continue. Having considered all available facts and circumstances, the Court concludes that chapter 13 relief is not available to the Adams under the standards applicable as of the Petition Date, and dismissal of this bankruptcy case is the appropriate remedy.

## BACKGROUND

A.  The Financial Picture

The Adams filed their chapter 13 case almost two years ago, on January 7, 2022 ("Petition Date"). In their initial schedules of assets and liabilities and statement of financial affairs, filed about two weeks later, they reported assets of $1,696,937.14, secured liabilities of $500,503.53, and unsecured liabilities of $179,381.80.[2] The Adams reported combined gross monthly income of $13,086.60 and

---

[2] ECF No. 16 at p. 1.

2

monthly expenses of $9,428.46, which left them with reported net monthly income of $3,658.14.[3]

Since the Petition Date, the Adams amended their schedules and statements six times.[4] No satisfactory explanation has ever been offered for the extraordinary number of revisions.

Unsurprisingly, the HOA contended that the multiple recalculations, reclassifications, and re-jiggering of assets, liabilities, current income, and current expenses were indicative of bad faith and represented an abuse of the bankruptcy process. For their part, the Adams professed that they were merely taking steps to ensure the utmost accuracy of the schedules and statements each time new information (or a new understanding of existing information) came to light.

Regardless of the motivation for the multiple revisions, the most recent amendment of the Adams' schedules and statements (ECF No. 239) was filed on August 16, 2023, and shows that the Adams' assets exceed their liabilities by almost a half-million dollars.

| Assets | $2,232,587.14 |
|---|---|
| Secured Liabilities | $530,154.72 |
| Unsecured Liabilities | $1,203,193.90 |
| Net Financial Status (assets in excess of liabilities) | **$499,238.52** |

---

[3] ECF No. 1 at pp. 35-38.

[4] ECF Nos. 40, 48, 101, 144, 210, and 239.

The largest portion of the increase in the Adams' unsecured liabilities is a loan from Thierry Lagesse in the amount of $712,253.80 which is described as the "purchase price tendered by Debtors to Claudia Candolo on or about August 1, 2018 for purchase of Unit D at 4408 S. Ocean, Highland Beach, FL 33487 + interest."[5] Another large unsecured obligation is listed as $275,000 due to the HOA for attorney fees in the case the HOA filed against Candolo in the Palm Beach County Circuit Court, case no. 50-2018-CA-007778(AD).[6]

A prior amendment of Debtors' schedules (ECF No. 210) reveals that the Adams' current combined monthly income exceeds monthly expenses by just under $2000 per month.

| Combined Monthly Income | $11,105.09 |
| --- | --- |
| Expenses | $9,288.46 |
| Net Monthly Income (income in excess of expenses) | **$1,816.63** |

B.    The Foreclosure Judgment

The primary motivation for the Adams' bankruptcy filing was the entry of a Final Judgment held by the HOA against the Adams' residence at 4408 S. Ocean Blvd., Apt B, Highland Beach, FL (the "Property"). The Foreclosure Judgment scheduled a foreclosure sale of the Property on November 15, 2021.[7] That sale has yet to occur because of the filing and pendency of this Bankruptcy Case, and the Adams

---

[5] ECF No. 239, p. 24.

[6] ECF No. 239, p. 19.

[7] ECF No. 86-2, p. 13-14.

continue to reside at the Property. This turn of events led to relentless litigation within this Bankruptcy Case.

For context, it helps to understand that the HOA governs the administration of a four-unit complex known as "Highland House of Palm Beach Condominium" ("Highland House"). Steven Parks and Diana Cuervo-Parks reside in two of the units.[8] During the Bankruptcy Case, Mr. Parks obtained the right to purchase Apt. D at Highland House, which the Adams had previously closed on without the seller complying with the HOA restrictions mandating that the HOA has a right of first refusal to purchase a unit offered for sale. The Adams reside in Apt. B, the fourth unit in Highland House. Mr. and Mrs. Parks have taken over leadership of the HOA, and the Adams are no longer eligible to participate in management of the HOA.[9]

In their roles as President and Vice-President, Mr. and Mrs. Parks submitted evidence during the pendency of this Bankruptcy Case in the form of HOA meeting minutes showing a vote (conducted solely by Mr. and Mrs. Parks) to impose special assessments.[10] The Adams never paid the special assessments. Their failure to do so led to entry of the Final Judgment.

The HOA contended that the Adams filed their Bankruptcy Case purely to evade payment of the Final Judgment and continue litigation over the ownership of

---

[8] ECF No. 86-2, p. 3.

[9] ECF No. 86-2, p. 5 (¶ 9) and ECF No. 86-4, p. 1 (Meeting minutes indicating that the remaining "Directors of the Board" eligible to vote at the meeting were (solely and exclusively) Mr. and Mrs. Parks.

[10] ECF No. 86-4, p. 2 ("Upon motion made by Steven N. Parks, and thereafter seconded by Diana Cuervo-Parks, the Directors of the Board voted and unanimously approved and RESOLVED that a Special Assessment in the amount of $13,000 per unit be levied ….").

5

Apt. D at Highland House. The Adams countered that the filing was a genuine attempt to restructure personal finances and pay necessary obligations, including current and past due HOA assessments relating to the Final Judgment and interest arising as a result of non-payment of the Final Judgment.

C. Objection to Confirmation

The HOA included an objection to confirmation as part of the Dismissal Motion. In support of the objection, the HOA argued that the Adams cannot demonstrate that continuing in chapter 13 would serve the best interests of creditors. The HOA sought dismissal of the Bankruptcy Case or conversion to chapter 7 as the remedy for the Adams' failure to propose a plan that satisfies 11 U.S.C. § 1325(a)(4), which requires a chapter 13 plan to provide creditors at least the amount that they would receive if a chapter 7 trustee administered the bankruptcy estate.

D. Additional Briefing

At the conclusion of the Evidentiary Hearing, the Court invited counsel for both sides to submit additional briefing on central legal issues. The parties timely complied. The HOA's submission focused upon the Adams' eligibility under 11 U.S.C. § 109(e) for chapter 13 relief and argued that the Bankruptcy Case is, essentially, a delay tactic designed solely to prejudice the HOA's ability to foreclose. The Adams' submission provided an accurate but anodyne synopsis of the status of the law as it relates to conversion or dismissal of a typical chapter 13 case.

## ANALYSIS

A. <u>Debt Limits</u>

The Court will begin with the simplest points first. The HOA correctly observed that evidence and testimony presented at the Evidentiary Hearing demonstrated that, as of the Petition Date, the Adams' unsecured debts exceeded $419,275.00, which was the maximum debt limit imposed by 11 U.S.C. § 109(e) for chapter 13 eligibility as of the Petition Date.[11] The Adams' most recent amended schedules listed general (nonpriority) unsecured liabilities of $1,203,193.90.[12]

Schedules and statements are intended to reflect the status of debtors as of the Petition Date. By amending their schedules to properly reflect general unsecured debts in excess of $1,000,000 as of the Petition Date, the Adams conceded that they did not qualify to seek relief as chapter 13 debtors under the Bankruptcy Code as in effect on the Petition Date.

B. <u>Eligibility for Confirmation</u>

The next question, eligibility for confirmation, is also easily answered. Because the Adams did not qualify for chapter 13 relief as of the Petition Date under the applicable debt threshold, they cannot propose or confirm a chapter 13 plan in this

---

[11] As of the Petition Date, the applicable debt limitation for a chapter 13 debtor pursuant to § 109(e) was $419,275. That amount increased to $465,275 as of April 1, 2022, which was the debt limit in effect until the effective date of the Bankruptcy Threshold Adjustment and Technical Corrections Act, Pub. L. 117–151, §2(i)(1)(A), which permitted chapter 13 debtors to have a combined total of $2,750,000 of both secured and unsecured debt. Pursuant to the Act, the amendment of §109(e) took effect on the date of enactment of the Act, and was not to be retroactively applied in contrast to other amendments of existing law contained in the Act.

[12] ECF 239, p. 1.

Bankruptcy Case.[13] Confirmation of the current (Ninth Amended) plan is thus a moot issue.

### C. Conversion or Dismissal

The third inquiry, conversion or dismissal, is more complicated. The standard for both options is the same: cause, which the Bankruptcy Code does not define. As with most good faith/bad faith analyses, the standard is the totality of the circumstances. Within the Eleventh Circuit, *Kitchens v. Ga. Railroad Bank and Trust Co. (In re Kitchens)* provides the appropriate multi-factor test. 702 F.2d 885, 888-89 (11th Cir. 1983) (listing 11-factor test).[14] The *Kitchens* test is not exhaustive, which means that a bankruptcy court may expand its analysis to include other factors. *Id.* at 889. The end result is, as noted, a totality of the circumstances approach that is both flexible and comprehensive. *Brown v. Gore (In re Brown)*, 742 F.3d 1309, 1316-17 (11th Cir. 2014).

---

[13] *See* n.10, above.

[14] The factors are:

(1) The amount of the debtor's income from all sources;
(2) The living expenses of the debtor and his dependents;
(3) The amount of attorney's fees;
(4) The probable or expected duration of the debtor's chapter 13 plan;
(5) The motivations of the debtor and his sincerity in seeking relief under the provisions of chapter 13;
(6) The debtor's degree of effort;
(7) The debtor's ability to earn and the likelihood of fluctuation in his earnings;
(8) Special circumstances such as inordinate medical expense;
(9) The frequency with which the debtor has sought relief under the Bankruptcy Reform Act and its predecessors;
(10) The circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors; and
(11) The burden that the plan's administration would place on the trustee.

*Id.*

Fortunately, the Court need not engage in step-by-step analysis of the *Kitchens* factors when considering conversion to chapter 7 for one very simple reason: the Adams are not typical consumer debtors.[15] They are both balance sheet and cash flow solvent, with assets and liabilities that exceed the usual amounts for either chapter 7 or chapter 13 relief. Although bankruptcy relief might be available in the form of conversion to chapter 7, conversion would not benefit all general unsecured creditors more than a dismissal of the bankruptcy case. The facts underlying this bankruptcy case also indicate that pursuit of bankruptcy relief was probably (at least in part) a litigation strategy. The Court will explain.

D. The Means Test

Although not directly relevant to the question of dismissal, a brief explanation of the means test might help provide context for the remainder of the Court's analysis. The means test was one of the key components of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA), which Congress enacted in 2005 to address perceived abuses of the bankruptcy system. *Milavetz, Gallop & Milavetz, P.A. v. U.S.*, 559 U.S. 229, 231-232 (2010). The means test is intended to ensure that debtors who can pay creditors some amount do, in fact, pay them as much as they are able. *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 64, 70-71 (2011); *In re Powers*, 534

---

[15] Pursuant to §707(b), the first part of the means test appliable to consumer debtors requires a debtor's income to be equal to or less than the median income for a household of similar size in the debtor's geographic area. The 2022 median family income in Florida for a household of the Adams' size was $66,748. (Analysis requires use of 2022 data because the Petition Date occurred in January 2022.)

*See* https://www.justice.gov/ust/eo/bapcpa/20210515/bci_data/median_income_table.htm.

B.R. 207, 215 (Bankr. N.D. Ga. May 1, 2015) (citing same); *In re Henebury*, 361 B.R. 595, 603-04 (Bankr. S.D. Fla. 2007).

Bankruptcy Code § 707(b) describes the means test and provides the applicable formula for determining a debtor's eligibility for chapter 7 relief. Framed in the negative, the statute does not directly state the criteria for eligibility. Instead, it describes situations where a presumption of abuse of the bankruptcy process arises that might warrant dismissal, and includes a financial threshold within that description. In relevant part,[16] § 707(b) provides:

> **(b)(1)** After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.  In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).
> **(2)(A)(i)** In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of-
> **(I)** 25 percent of the debtor's nonpriority unsecured claims in the case, or $8,175, whichever is greater;  or
> **(II)** $13,650. [17]

---

[16] Section 707(b) is lengthy. The balance of § 707(b) includes (among other things) statutory language describing allowable "reasonable and necessary" monthly expenses, calculation of potential payments, and situations for which an exception to the means test and/or presumptions of bankruptcy abuse may (or may not) apply.

[17] The amounts specified in the above recitation of § 707(b)(2)(A)(i)(I) and (II) include the statutory amounts as of the Petition Date. *See* Legislative History to 11 U.S.C. § 104 (Notice dated Jan. 31, 2022,

Application of the means test results in a two-part inquiry. First, a potential debtor must determine (pre-filing) whether their median income[18] complies with the monetary limits described in the statute. If the answer is no, then the debtor is ineligible for chapter 7 relief and the second part of the inquiry is not relevant. If the debtor's income qualifies, then the next level of the inquiry focuses upon necessary and reasonable expenses.[19] The mechanical nature of the means test and codification of applicable amounts in the statute and other national standards[20] removes most of the discretion from the Court. *Henebury*, 361 B.R. at 603-04.

It is arguably possible that application of the means test is not mandatory in a conversion from chapter 13 to chapter 7. That being said, if a debtor is not eligible for chapter 7 as of the petition date, which is the metaphorical "line in the sand" for most bankruptcy-related analysis, then it stands to reason that a preliminary foray into chapter 13 may not cure chapter 7 eligibility issues. Ignoring application of the first part of the means test in a conversion situation perhaps might be (theoretically)

---

87 F.R. 6625 issued by the Judicial Conference of the United States adjusting dollar amounts effective as of April 1, 2022). The updated and historical figures may be found at https://uscode.house.gov.

[18] A six-month lookback period is typically used to address the potential for monthly fluctuations in income. Determination of median limits is by reference to standard data available here: https://www.justice.gov/ust/eo/bapcpa/20210515/bci_data/median_income_table.htm.

[19] *See* § 707(b)(2)(A).

[20] *See, e.g.,* § 707(b)(2)(A)(i)(V) ("[T]he debtor's monthly expenses may include an allowance for housing and utilities, in excess of the allowance specified by the Local Standards for housing and utilities issued by the Internal Revenue Service …."). *See also Ransom*, 562 U.S. at 64-66 (describing national standards).

11

permissible, but in this instance the Court will focus upon the numbers to ensure that all aspects of conversion and dismissal have been considered.

The first question is whether the Adams' pre-filing income is above the median for the geographic area. The Adams reported combined monthly income of $11,105.09, or $133,261.08 per year, on their most recent version of Schedule I.[21] According to Census Bureau data relied upon by the United States Trustee's office, the annual median family income for cases filed by a two-person family residing in Florida between May 15, 2021 and March 31, 2022 was $66,748.[22] This means that the Adams were well above the median income as of the Petition Date.

In order for the Adams to qualify for chapter 7 relief, their income would need to be reduced substantially by monthly expenses, but only to the extent permitted by the Bankruptcy Code. That calculation requires painstaking attention to detail and demonstrates why retention of bankruptcy counsel is strongly advised for above-median debtors. Official Form 122A-2 provides the necessary method (and form) for undertaking means test calculations.

Rather than crunch the numbers, the Court will skip over the level of granular analysis required to calculate the Adams' eligibility for chapter 7 under the second portion of the means test because there are at least two practical and equitable reasons (in addition to other reasons discussed in Section F below) why dismissal is the most appropriate remedy.

---

[21] ECF No. 210., p. 7.

[22] See https://www.justice.gov/ust/eo/bapcpa/20210515/bci_data/median_income_table.htm.

First, litigation costs in this bankruptcy case are already excessive. The parties have fought for years prepetition and that litigation continues to drive up attorneys' fees postpetition. Should the Court convert the case to chapter 7, then the chapter 7 trustee would be forced to either abandon existing litigation (and thus forfeit the only real non-exempt asset of value, namely the litigation claim against Claudia Candolo, a resident of Lugano Switzerland[23] asserting an entitlement to a refund of the purchase price paid by the Adams for Apt. D), or continue accruing administrative fees for litigation at a rapid clip. Both options jeopardize the potential payout for general unsecured creditors.

Second, the wisdom of proceeding with this bankruptcy case is dubious simply because the Adams have few non-exempt assets. Even if the Court converted to chapter 7 and a trustee immediately set about administering assets without further litigation, the end result would be a miniscule recovery for unsecured creditors that would more than likely be subsumed by professional fees and other administrative costs. In that situation, conversion simply does not make monetary sense as it would not benefit all creditors more than dismissal.

E. <u>Conversion to Chapter 11</u>

For the sake of completeness, the Court will briefly discuss the potential for conversion to chapter 11. The most obvious reason not to consider conversion to chapter 11 is that no party has sought that form of relief. The more important reason

---

[23] ECF No. 1 in Adv. Proc. 23-1158, p. 1. It is noteworthy that the docket in Adv. Proc. No. 23-1158 does not reflect that service of process has yet been effected on Ms. Candolo, notwithstanding that the complaint was filed on August 18, 2023.

13

is that creditors are highly unlikely to benefit from a forced conversion to chapter 11. Doing so would result in an immediate increase in fees and expenses, including the imposition of quarterly U.S. Trustee fees. The net result would be a depletion of assets available for distribution, which defeats the bankruptcy purpose of any potential involuntary conversion.

F. Good Faith / Bad Faith Analysis

There are other reasons why the Court perceives that dismissal is the appropriate remedy. Analysis of the *Kitchens* factors indicates that the Adams' chapter 13 filing may lack the hallmarks of a good faith filing.

First, the Adams' endless rounds of revisions of their schedule of assets and liabilities and statement of financial affairs is suspect. The Adams revised their schedules and statements at least six times over the course of about eighteen months. Although a certain number of corrections and refinements are permissible and perhaps somewhat expected in a consumer bankruptcy case, the quantity of amendments by these debtors is excessive and highly unusual.

Second, this case is, for all practical purposes, a two-party dispute. On the one hand, we have the Adams. On the other, we have the two-attorney team of Parks and Cuervo-Parks, the Adams' unwilling neighbors. The acrimony between the parties is longstanding, and the record reflects HOA administration tactics that seem to have been designed to adhere to the letter of the law while skirting the intent of the law. Regardless of the Court's impressions about those machinations, the validity of the Final Judgment is not in dispute, and the Final Judgment is undeniably the driver

14

of this entire bankruptcy process. The Adams are not seeking to reorganize a host of debts; they are fighting one very recalcitrant business entity composed of their next-door neighbors, which is the only non-debtor party to appear in this case. The fight is ugly, but it does not appear to be driven primarily by finances.

Third, outside of the HOA dispute and the debt due Thierry Lagesse for the purchase of Apt. D, the Adams have disclosed primarily unsecured credit card debt, the amount of which appears manageable based upon the Adams' disclosure of net disposable income. Dismissal of the case will allow the Adams to negotiate payment plans with their credit card companies, failing which unsecured creditors may pursue state court remedies for non-payment. Likewise, dismissal of the case will facilitate the Adams obtaining the necessary financing to pay off the Final Judgment to avoid foreclosure of Apt. B of Highland House, as well as obtaining a refund of the purchase price paid by the Adams to Ms. Candolo in order to repay Mr. Lagesse.

## CONCLUSION

The Adams' schedules and statements speak for themselves. Based upon debt limitations for chapter 13 debtors as of the Petition Date in this Bankruptcy Case, the Adams were ineligible for relief under chapter 13 because of the amount of their unsecured non-contingent debt. Their decision to file for chapter 13 relief is questionable, but Mr. Adams testified that he did so upon advice of counsel, and the Court will not penalize the Adams for pursuing a legal strategy that an attorney facilitated and perhaps encouraged.

The Final Judgment may indeed represent an onerous burden for the Adams, but it is not one that this Court can address given the procedural posture of this Bankruptcy Case. The situation is what it is. The Court recognizes that the Adams may be frustrated by this Court's refusal to confirm a chapter 13 plan because of the eligibility requirements to obtain relief under chapter 13 as of January 2022. However, the flip side of that situation is that the Parks have contended with the cost and delay caused by the Adams' failure to provide accurate information about their financial condition as well as the non-payment of the special assessment and the litigation regarding Apt. D. Both parties have essentially lost due to their inability to negotiate a consensual result in this Bankruptcy Case and the underlying state court litigation between them.

Accordingly, the Court ORDERS that:

1. The Dismissal Motion is GRANTED in part and DENIED in part, solely as set forth herein.
2. The Bankruptcy Case is DISMISSED without a prejudice period.
3. The HOA's request to convert this case to a case under chapter 7 is DENIED AS MOOT.
4. The HOA's objection to confirmation is DENIED AS MOOT.

###

Copy furnished to:

David Ray, Esq., Attorney for Highland House

*Attorney Ray is directed to serve this Memorandum Opinion and Order upon all interested parties in compliance with all applicable rules.*